IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUNHONG LU, as Mother and Next Friend of SHEN HAOCHEN, a Minor,<br><br>          Plaintiff,<br><br>    v.<br><br>THE BOEING COMPANY,<br><br>          Defendant. | Case No. 13 C 7418<br>Related to<br>Case Nos. 13 C 7421;<br>13 C 7422; 13 C 7424;<br>13 C 7428; 13 C 7432;<br>13 C 7434<br><br>Hon. Harry D. Leinenweber |

## MEMORANDUM OPINION AND ORDER

These cases are before the Court for consideration of Plaintiffs' Motions to Reconsider. In seven of these cases, the Court issued a Memorandum Opinion and Order on December 16, 2013 that granted Plaintiffs' Motions to Remand. Defendant Boeing Company has asked the Court to reconsider that ruling. After considering the evidence submitted by the parties, the Court concludes that it lacks jurisdiction to hear these cases. For the reasons stated herein, the Motions to Reconsider are denied.

The rest of these cases were filed after the original ruling was issued, and the Motions to Remand are pending. The parties have stipulated that all of these cases involve the same jurisdictional issues, and that except for one potential issue related to the time when evidence became available, all Plaintiffs are situated similarly. Because the Court resolves the

jurisdictional issue on the evidence presented, this ruling applies to all Plaintiffs.  The Court will enter a separate order in those cases that grants the remand motions for the reasons discussed in this Opinion and the Court's December 16, 2013 Opinion.

## I.  BACKGROUND

These cases arise out of the crash of Asiana Airlines Flight 214 into the seawall at San Francisco International Airport on July 6, 2013.  At the end of the flight, the airplane was flying over the waters of the San Francisco Bay toward runway 28L, where it was due to land.  Runway 28L is separated from the bay by a seawall.  The airplane's approach was too low and too slow, and just as the airplane reached the runway, the rear landing gear and tail struck the seawall and broke off.  The plane skidded, out of control, along the runway.

Plaintiffs allege that the passengers and crew suffered a variety of injuries.  Several flight attendants were hurt when they were thrown – still in their seats – from the plane onto the runway.  The emergency evacuation slides deployed inside the aircraft and pinned some of the passengers in their seats.  Some seatbelts jammed, which required flight attendants and rescue workers to use knives to free the trapped passengers.  Many of the oxygen masks failed to deploy, which left those passengers stuck inside the smoke-filled plane with limited available oxygen.

Several passengers filed tort claims against Defendant Boeing, the airplane's manufacturer, in Illinois state court.  Defendant removed the cases to this Court, asserting both admiralty and federal officer jurisdiction.  Plaintiffs filed Motions to Remand, and the cases were consolidated so that the Motions could be considered together.  On December 16, 2013, the Court issued a Memorandum Opinion and Order that granted the remand motions after finding that admiralty and federal officer jurisdiction were lacking.  ECF No. 22.  The Court lacked admiralty jurisdiction because Plaintiffs' injuries neither occurred on water nor became inevitable over water:  "[t]he passengers on Flight 214 never faced inevitable injury, and thus their tort was consummated when the airplane struck the terrain."  ECF No. 22 at 7.  Federal officer jurisdiction was lacking because "Plaintiffs have not challenged any of [Defendant's] actions taken under color of law."  ECF No. 22 at 20.  Defendant has asked the Court to reconsider its jurisdictional holdings.

Defendant points to evidence (the parties dispute whether the evidence is "new") that purports to show that the crash became inevitable while the plane was still over water.  This evidence includes measurements of the airplane's precise altitude, speed, and pitch, as well as a recording of cockpit audio from the moments leading up to the crash.  Seventeen seconds before the plane hit the seawall, one pilot said "it's low."  About eight seconds before

impact, the same pilot said "speed."  At that point, the engine thrust levers were at the idle position, and one of the pilots moved the levers to full throttle.  Three seconds before impact, the pilot said "go around," meaning abort the landing by applying full power to the engines and climbing in altitude before attempting to land again.  At that time, the plane was 35 feet above ground level, moving at 103 knots, which was 34 knots slower than the correct approach speed.  Two seconds before impact, the pilots attempted to control the airplane's pitch, and the plane sped up as the engines responded to the increased thrust.  Despite these recovery maneuvers, the plane crashed onto the runway after its rear landing gear got caught approximately five feet below the top of the seawall.

In addition to this flight data, Defendant has submitted derivative evidence, including simulations of how the airplane might have responded to other possible last minute adjustments. The National Transportation Safety Board Aircraft Performance Group (the "NTSB Group") examined what would have been required for the airplane to safely "go around."  The Group concluded that

> The simulation results indicated that the [airplane] had adequate performance capability to accomplish a go-around initiated no later than 11 to 12 seconds prior to ground impact (depending on technique), assuming a minimum aft fuselage clearance during the maneuver of 30 feet above ground level (AGL).  For reference purposes, the accident flight crew initiated a go-around by advancing the

throttles about 7 seconds prior to ground
impact.

ECF No. 37, Ex. A-1, at 2.

Defendant has also submitted commentary on the evidence, in
the form of declarations from aeronautical engineers and other
experts.  From the NTSB Group's conclusion, Defendant's air safety
investigation "Associate Technical Fellow" opined that "the
accident became inevitable while the accident aircraft was still
over water on approach to San Francisco International Airport."
ECF No. 37, Ex. A, at ¶ 10.  Defendant's "Technical Lead Engineer"
for the class of airplane at issue explains in his declaration that
"[t]he pilots were using all available pitch control and engine
control to arrest their descent and avoid contact with the ground
or water."  ECF No. 42-1 at ¶ 11.  Based on his review of the data,
the same engineer concluded that "the airplane's speed and altitude
were so low that recovery of the airplane was impossible and a
crash was inevitable."  ECF No. 42-1 at ¶ 3.

Defendant also relied on the declaration of John Hansman
("Hansman"), a Professor of Aeronautics and Astronautics.  Hansman
analyzed the flight data and explained that the flight crew
initiated the "maximum performance escape maneuver" at 2.1 seconds
prior to impact, while the airplane was still over the Bay.
ECF No. 37, Ex. B, at ¶ 24.  Hansman noted that the "maximum
performance escape maneuver was not successful" – meaning that the
crash happened despite the fact that, at that time, the pilots

- 5 -

could not have added more thrust or done any more to avoid the
crash.  *Id.*   From this evidence, Hansman concluded that "the
accident was inevitable at least 2.1 seconds prior to impact when
the aircraft was fully over water."  *Id*.

## II.  ANALYSIS

A motion to reconsider is not a vehicle for rearguing motions
decided previously.  *Oto v. Metro. Life Ins. Co.,* 224 F.3d 601, 606
(7th Cir. 2000).   To prevail, a movant must present newly
discovered evidence or show manifest errors of law or fact.  *Ahmed
v. Ashcroft,* 388 F.3d 247, 249 (7th Cir. 2004).

### A.  Admiralty Jurisdiction

#### 1.  *Legal Standard*

A party asserting federal admiralty jurisdiction must satisfy
a "location" requirement by showing that the tort either occurred
on navigable water or was caused by a vessel on navigable water.
*Grubhart v. Great Lakes,* 513 U.S. 527, 534 (1995).   Generally, a
tort occurs when the injury is sustained, and admiralty
jurisdiction hinges on the victim's location at that time.  *Minnie
v. Port Huron Terminal Co.,* 295 U.S. 647, 648 (1935); *T. Smith &
Son v. Taylor,* 276 U.S. 179, 182 (1928).

In some circumstances, courts have determined that a tort
"occurred" before the actual harmful impact, at the point when
injury became inevitable.  *In re Air Crash at Belle Harbor, New
York,* MDL 1448, 2006 WL 1288298, at *12 (S.D.N.Y. May 9, 2006).   In

- 6 -

*Belle Harbor,* for example, the tort occurred when, several minutes after takeoff while the airplane was at an altitude of 2,500 feet, the airplane's vertical stabilizer separated from the plane, which left it incapable of flight and certain to crash and kill everyone on board.   *Id.*   In another case, the tort occurred when the aircraft "sustained a critical loss of tail rotor control" that rendered it incapable of landing safely. *Brown v. Eurocopter S.A.,* 38 F.Supp.2d 515, 516-18 (S.D. Tex. 1999).

Defendant acknowledges that the airplane crashed into land. Thus, to establish that the tort occurred over water, Defendant must show that, at some point while the airplane was over water, the passengers faced certain injury.

It bears emphasizing that the inevitability rule applies where *injury* is inevitable, not simply where a crash is inevitable. Because this Court viewed neither the crash nor any resulting injuries as inevitable, the Court's December 16, 2013 Opinion did not always distinguish between the "crash," the "injury," the "tort," and the "accident."   And in cases such as *Belle Harbor* and *The Strabo,* where the falling victims faced certain harm, there was no difference between the "crash" and the "injury." *Belle Harbor,* 2006 WL 1288298, at *12; *The Strabo,* 98 F. 998, 999 (2d Cir. 1900). Thus, the nuances of "crash" versus "injury" did not affect the Court's analysis and did not need to be parsed.

But the Court made clear that its focus was the point of injury: the Opinion explained that "passengers on Flight 214 never faced inevitable injury, and thus their tort was consummated when the airplane struck the terrain." ECF No. 22 at 7. The Court's analysis of relevant precedent focused similarly on the fact that torts were considered complete when *injury* was certain. ECF No. 22 at 6 (quoting *Belle Harbor,* 2006 WL 1288298, at *12 (where, from the moment the airplane lost its vertical stabilizer, "the deaths of all those aboard the Aircraft were inevitable")); ECF No. 22 at 7 (quoting *The Strabo,* 98 F. at 999 (where the victim, thrown from a ship, "was subjected to conditions inevitably resulting in physical injury, wherever he finally struck")). Thus, in order for the Court to determine that a tort was complete before the injury was sustained, the Court must be able to fix the point at which injury, not just a crash, was inevitable.

### *2. Analysis*

Defendant's Motion is supplemented by evidence that shows that the pilots recognized at least seventeen seconds before impact that the airplane was too low. About eight seconds before impact, the pilots began adjusting their approach by moving the engine thrust levers from idle to full throttle. Three seconds before impact, when the plane was 35 feet above ground level, moving at 103 knots, the pilot wanted to abort the landing and go around. Two seconds

before impact, the plane sped up as the engines responded to the increased thrust.

This evidence reveals that, in the moments leading up to the crash, the airplane responded to the flight crew's efforts to avoid a crash. One of the pilots increased the power to the engines, and the increased thrust caused the airplane to gain speed before it crashed. In the last three seconds before impact, the airplane descended roughly 40 feet: it went from 35 feet above ground level to the point five feet below the runway where the landing gear struck the seawall. There is no indication that the airplane was certain to descend 40 more feet, not 35 feet or fewer, given the increased engine thrust and the pilots' efforts to arrest the plane's descent. Because five more feet might have been enough to avoid injuring the passengers, any uncertainty over how much speed and lift could be gained creates uncertainty over whether the plane would crash at all.

It is also instructive that the pilots spent the flight's last moments maneuvering in a last-minute attempt to avoid a crash, not bracing for certain impact. The actions of the flight crew, including saying "go around" just three seconds before impact, indicate a subjective belief that the airplane was not certain to crash. This evidence shows that, in the final seconds of the flight, the airplane was responding to pilot controls and the pilots did not know whether the engines would respond with enough

thrust to lift the plane just a few more feet and thereby avoid the crash entirely.

Defendant's employees and experts viewed this evidence and the simulations based on it to conclude that the accident was inevitable at least a few seconds before impact.  But the NTSB Group's simulations operated on the premise that the airplane needed 30 feet of clearance for a safe go-around.  Defendant offers no reason why 30 is the magic number, or why 10 or fewer feet of clearance would not have given the plane enough space to avoid injuring the passengers.  In fact, if the airplane had just a few more feet of space, the pilots could have performed a so-called "touch-and-go landing," where the wheels touch pavement briefly before the plane takes off again.  This accident was the result of the landing gear striking the seawall five feet below ground level, not the crew's failure to execute a go-around with 30 feet of extra space.  Defendant's reliance on an arbitrary margin for error renders those conclusions unhelpful.

Defendant's evidence and supporting declarations suffer from another infirmity: their reliance on hindsight.  Defendant's conclusion that the crash was inevitable rests on two premises: (1) the crash happened, and (2) in the seconds before impact, there is nothing more that the pilots could have done to avert the crash. This chain of reasoning relies on a fallacy, sometimes called retrospective determinism, where the conclusion or end result is

assumed.  Defendant's evidence does not speak to the chance that the engines would provide enough thrust in the last two seconds before impact to lift the plane five feet – the evidence just takes as established that they would not.  That is, Defendant's evidence works backwards from the crash, it does not predict the crash or prove that the crash was the only possible outcome.  Flight 214 nearly reached the runway, and there is no evidence that the pilots knew then, or that any experts could predict now if given the flight data up to that point but not the end result, that the engines would not respond with enough thrust to lift the plane a few more feet and avoid a crash.

Defendant would have the Court view the flight frame by frame for the seconds leading up to the crash, with each moment an opportunity to say that the crash was inevitable so the tort was already complete.  Neither the *Belle Harbor* court nor the *Eurocopter* court had to go so far to find that the injury occurred before the actual harmful impact.  Rather, those courts determined that the aircraft in their case was doomed to crash and injure all passengers because of some failure or circumstances that could be linked definitively to the aircraft crashing.  That is, an aircraft that has lost its vertical stabilizer and engines (as in *Belle Harbor*) or sustained a critical loss of tail rotor control (as in *Eurocopter*) is sure to crash and injure its passengers, or at least so those courts found.

A clearer understanding of the background law helps illuminate why it is improper for the Court to work backwards from the crash to find some point at which the crash can no longer be avoided. Recall that admiralty jurisdiction depends on where the tort occurs, not where the victim ends up. *The Strabo,* 98 F. at 1000 ("It is not of vital importance to the admiralty jurisdiction whether the injury culminated on the [land] or in the water."); *see also,* ECF No. 22 at 4 (comparing *Taylor,* 276 U.S. 179, and *Minnie,* 295 U.S. 647). Thus, courts endeavor to avoid basing admiralty jurisdiction on the fortuity of whether an airplane happens to end up in land or water. *Executive Jet Aviation, Inc. v. City of Cleveland, Ohio,* 409 U.S. 249, 267 (1972) (explaining that it would be unacceptable to "make jurisdiction depend on where the plane ended up – a circumstance that could be wholly fortuitous and completely unrelated to the tort itself").

Confusion arises because the party seeking to invoke federal admiralty jurisdiction still must satisfy the locality requirement, so it *does* matter where the tort occurs. *Grubhart,* 513 U.S. at 534. Of course, as noted by the Court in *Executive Jet,* the location of the tort is also subject to chance. *Executive Jet,* 409 U.S. at 267. But precedent dictates that admiralty jurisdiction depends on the victim's location when the tort occurs, regardless of whether that location is the result of nothing more than chance. Thus the "fortuity" that courts are able to avoid is the fortuity

of where the victim ends up, not the fortuity of where the tort occurs.

Consistent with this principle, the court in *Belle Harbor* avoided basing its jurisdiction on the fortuity of whether the doomed airplane happened to end up in land or water. *Belle Harbor,* 2006 WL 1288298, at *12. But this is not a case like *Belle Harbor* in which the airplane was certain to crash and it was only a matter of where. Rather, the evidence shows that the issue in this case was whether the airplane would land safely or fly into the seawall. Defendant's "Technical Lead Engineer" declared that "there was nothing further the crew could do to prevent the airplane from hitting the seawall." ECF No. 42-1 at ¶ 12. Even though that conclusion was dubious for the reasons discussed above, the statement shows nonetheless that the question in this case was whether the airplane would crash into the seawall or whether it would land safely – there is no indication that crashing into water was at all likely. And this makes sense: it is reasonable to assume that the pilots reacted to their low, slow approach in the last seconds before impact because that is when they realized that something had to be done. If the airplane had been in worse shape – such that it might have crashed in the water, even farther from the beginning of the runway – the pilots might have realized their peril earlier and reacted sooner, thereby avoiding the accident completely.

If a plane is certain to crash into land, then there is no fortuity of "where the plane ends up" to be avoided.  The inevitability standard avoids basing federal jurisdiction on the fortuity of whether a doomed victim – who is certain to face injury regardless of where she lands – happened to crash into water or land.  *Belle Harbor,* 2006 WL 1288298, at *12 (establishing location based on the airplane's location when injury became inevitable, because "determining jurisdiction based on the location of the crash site would lead to unacceptably anomalous results").  The *Belle Harbor* court used the term "crash site" to refer to the location where the airplane ends up, which in that case was different than where the tort was complete.  In this case, because the choices were either a crash into land or a safe landing, there is no "fortuity of where the airplane ends up" to be avoided.  Thus, there is even less reason to use the inevitability rule to find that the tort occurred at some time other than when the plane struck the seawall.

This precedent illustrates that the inevitability standard is not a license to work backwards from the crash to find some point at which the crash can no longer be avoided.  It is better suited to situations, such as in *Belle Harbor* and *Eurocopter,* where the airplane and its passengers were truly doomed and the Court can pinpoint the time at which the tort was complete.  Defendant's experts rely on the fact of the crash to work backward and conclude

- 14 -

that the crash was inevitable, and thus their declarations are not helpful.

Apart from whether the crash was inevitable, there is no evidence that *injury* was inevitable.  Of course, for an airplane that is plummeting from 2,500 feet, as in *Belle Harbor,* crash and injury are one in the same, because the crash is certain to injure if not kill everyone on board.  But in this case there is no indication that every passenger was destined to be injured or in fact was injured.  Flight 214 was on a controlled glide at the runway's edge when it crashed and skidded onto the runway.  Some but not all passengers were pinned by inflated evacuation slides, and some but not all passengers were stuck when their seat belts jammed.  Some passengers were closer to emergency exits and had a better chance of escape, while some lacked functional oxygen masks and inhaled more smoke.  Of the three passengers killed in the accident, one died after the being run over by a fire truck, and another died in the hospital several days later.  ECF No. 1-1 at ¶ 17.  There is no reason to think that these injuries or deaths were inevitable two seconds before the airplane crashed.  Thus, it makes little sense for Defendant to argue that "passenger injury or death became inevitable while the aircraft was over water." ECF No. 42 at 8.  To the contrary, it is clear that different passengers suffered different injuries, depending on a variety of

factors that no expert has claimed could be predicted as of two seconds before impact.

The declarations offered in support of Defendant's motion do not distinguish between crash and injury. *See, e.g.,* ECF No. 42-1 at ¶ 12 (concluding that "there was nothing further the crew could do to prevent the airplane from hitting the seawall"). But for a crash landing such as this one, where the passengers may or may not be injured, the distinction between "injury" and "crash" matters. Defendant's declarations have little value because they fail to account for this difference.

In light of the foregoing, Defendant's renewed attempts to analogize this case to *Belle Harbor* are not persuasive. In *Belle Harbor,* as the Court discussed at length in its Opinion, the airplane's vertical stabilizer, rudder, and engines separated in-flight. *Belle Harbor,* 2006 WL 1288298, at *12. The airplane, at that point little more than a fuselage with wings, carried all passengers and crew with it as it plummeted from its altitude of 2,500 feet. *Id.* The court concluded that "the deaths of all those aboard the Aircraft were inevitable." *Id.* Here, in contrast, the passengers were at the verge of a safe landing and missed it by around five feet. The airplane was functional and responsive up until the crash. And even once the airplane crashed, it was not yet clear whether injuries would be sustained. These passengers

- 16 -

did not face certain injury and thus were not doomed in the same way that the *Belle Harbor* passengers were.

Defendant's evidence does not compel a factual finding that either the crash or any resulting injuries were inevitable before the crash itself. As the party asserting federal jurisdiction, Defendant has the burden of establishing that this tort occurred while the airplane was over water. Defendant's evidence has not persuaded the Court that this tort was complete before the airplane struck the seawall, which the parties agree is land. Therefore, the Court lacks federal admiralty jurisdiction.

### B. Federal Officer Jurisdiction

With regard to federal officer jurisdiction, Defendant argues that the Court failed to appreciate that the complaints include veiled challenges to Defendant's certification of the airplane. Defendant raised this argument previously, and just as before, has not offered any authority for its idea that a lawsuit against an airplane manufacturer for product liability and negligence is the same as a suit against the manufacturer's employees for negligent certification. It is true enough that the well-pleaded complaint rule does not apply to federal officer removal, but the Court has not relied on that rule. Rather, the Court follows the principle that federal officer jurisdiction exists only where the Defendant is sued for actions taken under color of law. *See*, *Ruppel v. CBS Corp.,* 701 F.3d 1176, 1180-81 (7th Cir. 2012). Defendant gives the

Court no compelling reason to reconsider its finding that Plaintiffs have not challenged any actions taken under color of law.  Thus the Court stands by its holding that the Court lacks federal officer jurisdiction.

### III.  CONCLUSION

For the reasons stated herein, Defendant's Motion to Reconsider is denied.  Pursuant to 28 U.S.C. § 1447 and Local Rule 81.2, the Clerk shall transmit the certified copy of the remand order fourteen (14) days after the entry of this order.


**IT IS SO ORDERED.**

---

Harry D. Leinenweber, Judge
United States District Court

Date:4/11/2014